NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0207n.06

No. 24-1132

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 17, 2025
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| CLIFFORD JAMES FROST, JR., ) | |
|     Plaintiff-Appellant, ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. ) | |
| DANA NESSEL, ) | |
|     Defendant-Appellee. ) | OPINION |

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Clifford Frost, Jr. appeals from the district court's order denying his motion for a preliminary and/or permanent injunction. Frost, a former Republican presidential elector candidate, sought to enjoin his prosecution in Michigan state court by Defendant Dana Nessel, Michigan's Attorney General, on behalf of the State of Michigan (the "State"). The State charged Frost and fifteen other individuals with various state law offenses for their alleged roles as "false electors" from Michigan for the 2020 presidential election. The State alleges that Frost and his fellow codefendants[1] attempted to subvert the results of the 2020 election by falsely asserting that they were Michigan's presidential electors, drafting documents to that

---

[1] While Frost was charged with fifteen other individuals, this case only concerns the State's prosecution of Frost. Before issuing the opinion from which Frost appeals, the district court remanded the State's prosecution of Amy Facchinello, one of Frost's codefendants, back to state court following Facchinello's attempt to remove her prosecution to federal court under 28 U.S.C. § 1442. *Michigan v. Facchinello*, No. 23-CV-00959, at *15 (W.D. Mich. Nov. 2, 2023). That case is separate from the instant action, and we do not consider the merits of the district court's rejection of Facchinello's § 1442 motion in this appeal.

effect, and transmitting their fraudulently cast votes to Congress for counting. The district court abstained from exercising jurisdiction and dismissed Frost's case under the doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971), which counsels against enjoining pending state court criminal proceedings. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Before discussing the details of Frost's appeal, we will briefly review relevant provisions of federal and state law governing the election of presidents and Michigan's presidential electors.

The President of the United States is "elected not by popular vote, but by winning the popular vote in enough States to have a majority in the Electoral College," *Buckley v. Valeo*, 424 U.S. 1, 106 (1976) (per curiam), which is comprised of "representati[ves] from each State," *United States Department of Commerce v. Montana*, 503 U.S. 442, 458 n.38 (1992), known as presidential electors. States have "far-reaching authority over presidential electors," *Chiafalo v. Washington*, 591 U.S. 578, 588 (2020), who "act by authority of the state that in turn receives its authority from the federal constitution," *Ray v. Blair*, 343 U.S. 214, 224–25 (1952). Article II of the Constitution provides, in part, that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." U.S. Const., art. II, § 1, cl. 2. "The Twelfth Amendment [to the United States Constitution] then tells electors to meet in their States, to vote for President and Vice President separately, and to transmit lists of all their votes to the President of the United States Senate for counting." *Chiafalo*, 591 U.S. at 590.[2]

---

[2] The President of the Senate is the Vice President of the United States. U.S. Const., art. I, § 3, cl. 4.

No. 24-1132, *Frost v. Nessel*

In accord with Article II's "express delegation[] of power to the States to act with respect to federal elections," *U.S. Term Limits, Inc. v. Thorton*, 514 U.S. 779, 805 (1995), Michigan law sets forth a process for the selection of Michigan's presidential electors. In presidential election years, Michigan requires each political party to "choose at its fall state convention a number of candidates for electors of president and vice-president" equal to Michigan's congressional delegation and to "forward by registered or certified mail a certificate containing the names of the candidates for electors to [Michigan's] secretary of state." Mich. Comp. Laws § 168.42. Among these candidates, "those whose names have been certified to the secretary of state by that political party receiving the greatest number of votes" during the presidential election are then "considered elected" as Michigan's presidential electors. *Id.* Michigan's state board of canvassers, a four-member board comprised of two members from each of Michigan's major political parties, *see id.* § 168.22(3), determines which political party received the greatest number of votes and, after making the determination, must "immediately prepare a certificate of determination and deliver the properly certified certificate of determination to [Michigan's] secretary of state," *id.* § 168.841(1). Following the board of state canvassers' determination, Michigan's governor must "issue a certificate of ascertainment of appointment of electors" setting forth the names of the appointed presidential electors and the results of the election and bearing the Michigan state seal and at least one other security feature. *Id.* § 168.46(1).

Federal law requires presidential electors to "meet and give their votes on the first Tuesday after the second Wednesday in December next following their appointment at such place in each State in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 7. Michigan, in turn, requires its presidential electors to cast their votes for president and vice president that same day in the senate chamber of the state capitol building. Mich. Comp. Laws

No. 24-1132, *Frost v. Nessel*

No. 24-1132, *Frost v. Nessel*

§ 168.47.  The presidential electors must then assemble lists of the individuals whom they voted to elect as president and vice president, "sign and certify, and transmit [the lists] sealed to the seat of the government of the United States, directed to the President of the Senate," who must, "in the presence of the Senate and House of Representatives, open all the certificates" for counting.[3]  U.S. Const. amend. XII.  This election certification process must occur in the afternoon of January 6 following a presidential election.  3 U.S.C. § 15.  After the presidential electors' votes are counted, "[t]he Person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed."  U.S. Const. amend. XII.

With this understanding of the process for selecting Michigan's presidential electors and electing presidents, we now turn to the events underlying Frost's appeal.

### A. Factual Background

#### 1. 2020 Presidential Election and Selection of Presidential Electors

The State claims that Frost and his codefendants attempted to upend the presidential elector selection process and supplant the majority will of Michigan's electorate in the 2020 presidential election by declaring themselves Michigan's presidential electors and submitting falsified presidential elector documents to Congress despite not being duly appointed presidential electors. The State detailed its claims against Frost in an Affidavit of Probable Cause sworn to by Special Agent Investigator Howard Shock before a state court magistrate on July 18, 2023.  As alleged in

---

[3] In addition to the President of the Senate, presidential electors must "immediately transmit at the same time and by the most expeditious method available the certificates of votes so made by them, together with the annexed certificates of ascertainment of appointment of electors" to their state's chief election officer, the Archivist of the United States, and "the judge of the district in which the electors shall have assembled."  3 U.S.C. § 11.  The Michigan Secretary of State is Michigan's chief election officer, *see* Mich. Comp. Laws § 168.21, and Lansing, where Michigan's presidential electors must cast their votes, *see id.* § 168.47, is located within the Western District of Michigan.

the affidavit, Frost and fifteen other individuals were selected as the Michigan Republican Party's 2020 presidential elector candidates during the 2020 Republican state party convention. In accord with Mich. Comp. Laws § 168.42, Frost and the fifteen other Republican presidential elector candidates' names were transmitted to the Michigan Secretary of State.

Following Michigan political parties' selection of presidential elector candidates, the 2020 general election took place on November 3, 2020. Approximately three weeks later, on November 23, 2020, the Michigan Board of State Canvassers met and certified the election results, including that Democratic Party nominees Joseph R. Biden, Jr., and Kamala D. Harris received the greatest number of votes in Michigan for president and vice president, respectively. Later that day, Michigan Governor Gretchen Whitmer issued a Certificate of Ascertainment certifying Michigan's 2020 presidential election results and declaring the election of sixteen individuals nominated by the Democratic Party as Electors of the President and Vice President of the United States of America. On December 14, 2020, the sixteen presidential electors declared by Governor Whitmer met in the state capitol building in Lansing, Michigan and voted to elect Joseph Biden, Jr., as president and Kamala D. Harris as vice president. Later that day, certificates of the Michigan presidential electors' votes were sent to the President of the Senate, the Archivist of the United States, the Michigan Secretary of State, and the Chief Judge of the United States District Court for the Western District of Michigan.

As further alleged in the State's affidavit of probable cause, another group of individuals attempted to cast votes for president and vice president on December 14, 2020. Individuals identifying themselves as "'Republican Party Electors' appeared at the grounds of the Michigan Capitol . . . and asserted the right to cast ballots as electors" before being "turned away by Michigan State Police" and denied entry into the state capitol building. Aff. of Probable Cause, R. 1-3, Page

No. 24-1132, *Frost v. Nessel*

ID #71–72.  That same day, Frost and other individuals nominated by the Michigan Republican Party as 2020 presidential elector candidates met at the Michigan Republican Party Headquarters in Lansing, where they signed a document entitled "Certificate of The Votes of The 2020 Electors From Michigan."[4]  The document stated that the signatories (i) were "the duly elected and qualified Electors for President and Vice President of the United States of America from the State of Michigan;" (ii) had convened at the state capitol on December 14, 2020, to perform their duties; and (iii) cast sixteen votes each for Donald J. Trump as president and Michael R. Pence as vice president.  Certificate of the Votes of the 2020 Electors From Mich., R. 1-2, Page ID #55.

The State's affidavit also alleges that, on December 14, 2020, a group including four of the 2020 Michigan Republican Party presidential elector candidates and a Michigan state representative appeared together at the state capitol building, where they were denied entry by the Michigan state police.  The state representative said that "the 'electors' were there to cast their votes," and an individual with the group who identified himself as Ian Northon "presented a manila envelope that was of the size appropriate to the '2020 Certificate of Votes' and attempted to deliver the envelope to the Michigan Senate."  Aff. of Probable Cause at Page ID #72.

The following day, two envelopes bearing 2020 Republican presidential elector candidate Kathy Berden's name, address, and purported Electoral College of Michigan Chairperson title were mailed from the East Lansing, Michigan Post Office.  On January 5, 2021, the National Archives and Records Administration received the original copy of the "Certificate of The Votes

---

[4] According to the affidavit, Frost was joined on December 14, 2020, by thirteen of the sixteen other individuals originally nominated by the Michigan Republican Party as 2020 presidential elector candidates.  The two missing Michigan presidential elector candidates, who did not sign the "Certificate of The Votes of The 2020 Electors From Michigan" document and were not charged by the State in connection with this activity, were replaced at the December 14, 2020, Republican Party Headquarters meeting by Kenneth Thompson and James Renner.  Thompson and Renner both signed the document.

No. 24-1132, *Frost v. Nessel*

of The 2020 Electors From Michigan" document, which listed Berden's name as the return address and "was of the size appropriate for the manila envelope" carried by Northon outside the Michigan state capitol the previous month. Aff. of Probable Cause at Page ID #73. The National Archives' Director of Legal Affairs and Policy sent a copy of the document and the envelope to the Michigan Department of Attorney General.

On January 6, 2021, then-Vice President Michael Pence, acting as President of the Senate, presided over a joint session of Congress for the counting of presidential electors' votes. *See* 3 U.S.C. § 15. During the joint session, Michigan's sixteen Electoral College votes were awarded to Joseph R. Biden, Jr., for president and Kamala D. Harris for vice president. More than two years later, a Michigan state investigator viewed a document received by priority registered mail at the United States Senate Archives which "appeared to be the same as the document received by the National Archives," and which was also the same size as the manila envelope carried by Northon, and listed Berden's name as the return address. Aff. of Probable Cause at Page ID #74.

### 2. Criminal Charges and State Court Proceedings

Following an investigation by the State, Frost and the fifteen other signers of the "Certificate of The Votes of The 2020 Electors From Michigan" document were charged with eight state law felonies on July 13, 2023, in connection with the 2020 presidential election. Frost and his co-defendants were charged with one count of conspiracy to commit forgery in violation of Mich. Comp. Laws § 750.157a, two counts of forgery in violation of Mich. Comp. Laws § 750.248, one count of conspiracy to commit uttering and publishing in violation of Mich. Comp. Laws § 750.157a, one count of uttering and publishing in violation of Mich. Comp. Laws § 750.249, one count of conspiracy to commit election law forgery in violation of Mich. Comp.

No. 24-1132, *Frost v. Nessel*

Laws § 750.157a, and two counts of election law forgery in violation of Mich. Comp. Laws § 168.933a.

In an attempt to dismiss the charges, Frost moved for summary disposition[5] before Michigan's 54-A Judicial District Court Criminal Division. Asserting that the State was "attempt[ing] to criminalize what was at most a futile political protest," Frost argued that the charges against him and his co-defendants should be dismissed as a matter of law because their actions did not constitute forgery under the Michigan Penal Code. Def.'s Mot. for Summ. Disposition, R. 1-21, Page ID #248, 250–51. In particular, Frost argued that the co-defendants' actions in signing the certified electors document did not constitute forgery because they did not expose anyone to a loss and the document "is exactly what it appears to be." *Id.* at Page ID #263 n.3, 265. The State opposed Frost's motion, arguing that summary disposition was inappropriate because summary disposition is unavailable in criminal proceedings.

During a hearing on September 14, 2023, the state court denied Frost's summary disposition motion. In doing so, the court agreed with the State that summary disposition was inappropriate and posited that the court should first hold a preliminary examination[6] to determine whether probable cause exists to support the charges brought against Frost and his co-defendants. The following month, on October 6, 2023, the state court issued a notice directing Frost to appear for a probable cause conference on December 15, 2023.

---

[5] In Michigan state court practice, summary disposition is equivalent to summary judgment in federal court. *Krawczyk v. Township of Hagar*, 673 F. App'x 508, 513 (6th Cir. 2016).

[6] In lieu of a grand jury indictment, Michigan's district courts conduct preliminary examinations to "determine whether probable cause exists to believe that a crime was committed and that the defendant committed it." *People v. Lowery*, 736 N.W.2d 586, 589 (Mich. App. Ct. 2007).

No. 24-1132, *Frost v. Nessel*

## B. Procedural History

Seeking to enjoin the Attorney General from prosecuting him for his conduct relating to the 2020 election and alleging a violation of his Fourteenth Amendment right to be free from bad faith prosecution, Frost commenced this action on November 21, 2023, pursuant to 42 U.S.C. § 1983. The following week, on November 30, 2023, Frost filed a Motion for Preliminary and/or Permanent Injunction, which included a request for expedited consideration of the motion. Frost urged the district court to preliminarily and permanently enjoin his prosecution in state court, arguing that the prosecution was brought in bad faith because the State had no reasonable expectation of obtaining a valid conviction. In support of his request for expedited consideration, Frost noted his impending December 15, 2023, state court hearing and argued that he would suffer irreparable harm if compelled to undergo a preliminary examination.

On December 15, 2023, following the Attorney General's response in opposition to Frost's expedited consideration request, the district court denied Frost's request for expedited consideration and ordered the Attorney General to respond to Frost's injunction motion by January 3, 2024. The district court reasoned that expedited consideration was inappropriate because a preliminary examination was not scheduled in Frost's state court case and the Attorney General had committed to not requesting a preliminary examination prior to January 30, 2024.[7] The Attorney General subsequently filed a brief opposing Frost's injunction request, and Frost responded with a reply brief in further support of his motion.

On January 18, 2024, the district court abstained from exercising jurisdiction and dismissed the action without prejudice. *Frost v. Nessel*, 712 F. Supp. 3d 1008, 1016–17 (W.D. Mich. 2024).

---

[7] According to the Attorney General, Frost's preliminary examination has already been conducted.

No. 24-1132, *Frost v. Nessel*

In doing so, the district court rejected Frost's contention that the bad faith exception to the *Younger* abstention doctrine warranted federal court intervention in Frost's criminal state court proceedings. *Id.* at 1015–16. The district court acknowledged that the bad faith exception "is extremely narrow" and reasoned that Frost's "opportunities in the state proceedings to present and prevail on his [defense] theories" "strongly militate[d] against applying the bad faith prosecution exception." *Id.* at 1015. In addition, the district court reasoned that Frost could not satisfy the bad faith exception because the State did not prosecute Frost "without a reasonable expectation of obtaining a valid conviction" and there was no "evidence to suggest that the charges against Frost have no basis in fact or law." *Id.* at 1016 (internal quotation marks omitted). In the district court's view, there was "nothing remotely unique or exceptional" that compelled federal court intervention in Frost's state court criminal prosecution. *Id.* Accordingly, the district court abstained from exercising jurisdiction pursuant to *Younger* and dismissed the case. *Id.* at 1016–17.

Frost filed a timely notice of appeal on February 13, 2024.

## II.  DISCUSSION

### A. Standard of Review

"We review *de novo* a district court's decision to abstain pursuant to the *Younger* doctrine." *Doe v. Univ. of Ky.*, 860 F.3d 365, 368 (6th Cir. 2017). This level of review is appropriate "'[b]ecause theories of state and federal law, and expressions of federalism and comity, are so interrelated in the decision to abstain' that 'such dispositions are elevated to a level of importance dictating *de novo* appellate review.'" *Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 700 (6th Cir. 2013) (alteration in original) (quoting *Traughber v. Beauchane*, 760 F.2d 673, 676 n.1 (6th Cir. 1985)).

No. 24-1132, *Frost v. Nessel*

### B. Analysis

On appeal, Frost contends that the district court erred by declining to exercise jurisdiction over this matter. To remedy this purported error, Frost urges this Court to either enjoin his prosecution by the State or remand this action to the district court for a determination of whether the Attorney General is prosecuting Frost in bad faith. Before addressing Frost's arguments in support of this position, we briefly review the *Younger* abstention doctrine.

#### 1. *Younger* Abstention

Federal courts are generally "obligat[ed] to adjudicate claims within their jurisdiction." *New Orleans Pub. Serv. Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 359 (1989). "However, in certain circumstances, allowing a federal suit to proceed threatens 'undue interference with state court proceedings,' and the proper course is for the federal court to abstain from entertaining the action." *Aaron v. O'Connor*, 914 F.3d 1010, 1016 (6th Cir. 2019) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013)). The Supreme Court identified one such circumstance in *Younger v. Harris*, in which it "held that federal injunctions against a state criminal law enforcement process could be issued only 'under extraordinary circumstances where the danger of irreparable loss is both great and immediate.'" *Fieger v. Cox*, 524 F.3d 770, 774 (6th Cir. 2008) (quoting *Younger*, 401 U.S. at 45). The theory of abstention articulated by the Supreme Court in *Younger* represents a "limited carve-out to federal courts' 'virtually unflagging obligation' to exercise their jurisdiction." *Hill v. Snyder*, 878 F.3d 193, 205 (6th Cir. 2017) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). Indeed, "*Younger* abstention is not a question of jurisdiction, but is rather based on 'strong policies counseling against the exercise of such jurisdiction'" to interfere in state court proceedings. *O'Neill v. Coughlan*, 511 F.3d 638, 641

No. 24-1132, *Frost v. Nessel*

(6th Cir. 2008) (quoting *Ohio Civ. Rts. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986)).

"The policies behind *Younger* include the notion of comity, in which courts consider the interests of both state and federal governments." *GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997). Comity requires "a proper respect for a state's sovereign ability to have its own courts determine its own law." *Carroll v. City of Mount Clemens*, 139 F.3d 1072, 1075 (6th Cir. 1998). Accordingly, *Younger* abstention stems from a desire to promote "common sense in the administration of a dual state-federal system of justice," *id.* at 1074, and "to prevent federal courts from interfering with the functions of state criminal prosecutions," *FCA US, LLC v. Spitzer Autoworld Akron, LLC*, 887 F.3d 278, 290 (6th Cir. 2018) (quoting *Doe*, 860 F.3d at 368), which are presumed to "provide[] the accused a fair and sufficient opportunity for vindication of federal constitutional rights," *Trainor v. Hernandez*, 431 U.S. 434, 442 n.7 (1977) (quoting *Kugler v. Helfant*, 421 U.S. 117, 124 (1975)).

Despite these considerations, abstention pursuant to *Younger* is not always appropriate. "A district court may [only] abstain under the *Younger* doctrine if three conditions exist: there are state proceedings that are (1) currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an adequate opportunity to raise his or her constitutional claims." *Nimer*, 707 F.3d at 701 (citing *Habich v. City of Dearborn*, 331 F.3d 524, 530 (6th Cir. 2003)). By failing to present any argument to the contrary before this Court, Frost effectively concedes that this case satisfies *Younger*'s three threshold conditions.

The initial condition—that "the state court proceeding was pending at the time the federal complaint was filed," *Loch v. Watkins*, 337 F.3d 574, 578 (6th Cir. 2003) (citing *Zalman v. Armstrong*, 802 F.2d 199, 204 (6th Cir. 1986))—is easily satisfied, as Frost's indictment remains

No. 24-1132, *Frost v. Nessel*

pending in state court and he has not "exhausted his state appellate remedies." *Id.* (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 (1975)). As Frost readily notes, he is "seek[ing] to enjoin an *ongoing* Michigan State prosecution." Appellant's Br., ECF No. 23-1, 13 (emphasis added). The second condition—that the state court proceeding concerns an important state interest—is also easily satisfied in the instant case because "state criminal proceedings involve important state interests." *Gonnella v. Johnson*, 115 F. App'x 770, 771 (6th Cir. 2004) (order); *see also Sprint Commc'ns, Inc.*, 571 U.S. at 73 (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 368) (noting that "state criminal prosecutions" fit within the "exceptional" circumstances subject to *Younger* abstention). "The third requirement for *Younger* abstention is that there be 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Cooper v. Parrish*, 203 F.3d 937, 954 (6th Cir. 2000) (quoting *Fieger v. Thomas*, 74 F.3d 740, 745 (6th Cir. 1996)). Frost has presented no compelling argument that he lacks such an opportunity. As Frost acknowledged in his briefing before this Court, Michigan state courts are "legally required" to consider the sufficiency of the charges pending against him. Appellant's Br. at 31. In explaining our analysis of the third *Younger* consideration, we have stated that "[a]bstention is appropriate 'unless state law *clearly bars* the interposition of the constitutional claims.'" *Am. Fam. Prepaid Legal Corp. v. Columbus Bar Ass'n*, 498 F.3d 328, 334 (6th Cir. 2007) (quoting *Squire v. Coughlan*, 469 F.3d 551, 556 (6th Cir. 2006)). Accordingly, we have previously rejected "attempt[s] to obtain federal review of state court procedures in a criminal case before the state court has had the opportunity to decide them finally." *Foster v. Kassulke*, 898 F.2d 1144, 1146 (6th Cir. 1990). Frost similarly seeks to bypass state court review of his claims in favor of federal intervention. However, Frost bears the burden of establishing a barrier posed by Michigan law to the review of his constitutional

No. 24-1132, *Frost v. Nessel*

claims in state court. *Fieger*, 74 F.3d at 746. Because Frost has failed to establish any such barrier, we find that the third *Younger* condition is also satisfied.

### 2. Bad Faith Exception

Despite the instant action's satisfaction of the three *Younger* preconditions, Frost could conceivably be entitled to federal court intervention in his state court prosecution if "there is a showing of bad faith, harassment, or another extraordinary circumstance that makes abstention inappropriate." *Graves v. Mahoning Cnty.*, 534 F. App'x 399, 406 (6th Cir. 2013) (citing *Am. Fam. Prepaid Legal Corp.*, 498 F.3d at 332). Frost argues that the Attorney General is prosecuting him in bad faith, which "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler*, 421 U.S. at 126 n.6. In support of this argument, Frost directs our attention to public statements allegedly made by the Attorney General which, Frost contends, demonstrate infirmities in the legal theory undergirding his criminal case and the political biases purportedly motivating his prosecution. In addition, Frost contends that the Attorney General's bad faith is apparent because his alleged actions do not constitute forgery under Michigan law. In contrast, the Attorney General posits that Frost's arguments are typical defenses raised by criminal defendants that do not warrant federal interference in Michigan state court proceedings.

Frost's arguments, which essentially dispute the State's interpretation of Michigan's criminal laws, do not establish bad faith for purposes of *Younger* abstention because "[t]he mere possibility of erroneous application of [a] statute does not amount 'to the irreparable injury necessary to justify a disruption of orderly state proceedings.'" *Cameron v. Johnson*, 390 U.S. 611, 621 (1968) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965)). Frost's suggestion otherwise would effectively require the State to "prove [his] guilt[] in the[se] federal proceeding[s]

No. 24-1132, *Frost v. Nessel*

to escape the finding that the State had no expectation of securing valid convictions." *Id.* Such a result is untenable in our dual state-federal criminal justice system. Instead, it is for Michigan courts in the first instance to "correct any misapplication of . . . state criminal laws." *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).

Frost does not question the competency of Michigan's courts to consider his challenges to the adequacy of his criminal charges, and we must "assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987). Instead, Frost objects to being subjected to the state court's rulings and procedures. *See* Appellant's Br. at 19 ("Because no crime was committed, Frost has the right under the Fourteenth Amendment to be free from prosecution for conduct that as a matter of law, could not have constituted a crime—not starting after his preliminary examination, or at any later date, but now."). However, "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do[es] not constitute [the kind of] 'irreparable injury,'" that warrants abstention pursuant to *Younger*. *Kugler*, 421 U.S. at 124 (quoting *Younger*, 401 U.S. at 46). In addition, Frost's qualms with the adequacy of the State's charging documents do not automatically convert his prosecution into a product of bad faith. This is particularly so where, as here, state court remains a viable forum for the consideration of Frost's arguments. *See Gonnella*, 115 F. App'x at 772 (rejecting a bad faith exception argument "[b]ecause the alleged threat to [the defendant's] federal rights is one that can be eliminated by his defense against the criminal prosecution"); *see also Ballard v. Stanton*, 833 F.2d 593, 594 (6th Cir. 1987) ("Where there exists the possibility of raising and correcting constitutional claims in state courts, the principles of federalism and comity expressed in *Younger* require that a criminal defendant must first 'exhaust

No. 24-1132, *Frost v. Nessel*

his state appellate remedies before seeking relief in the District Court.'" (quoting *Huffman*, 420 U.S. at 608)).

While *Younger* "does not require federal abstention when the state court proceeding is brought in bad faith or with the purpose of harassing the federal plaintiff," *Zalman*, 802 F.2d at 205, "[s]uch cases . . . are exceedingly rare, particularly where a plaintiff seeking to defeat an abstention argument has failed to avail himself first of state appellate processes before seeking relief in federal court," *Tindall v. Wayne County Friend of Court*, 269 F.3d 533, 539 (6th Cir. 2001). Given the narrow interpretation afforded to *Younger* abstention's exceptions, *see Zalman*, 802 F.2d at 205, and Frost's limited "resort to Michigan courts for relief" thus far, *Tindall*, 269 F.3d at 540, we decline Frost's request to circumvent the Michigan courts' jurisdiction over his state court prosecution.

### III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.